Dylan McFarland
KNIGHT NICASTRO MACKAY, LLC
283 W. Front Street, Ste. 203
Missoula, MT 59802
Email: mcfarland@knightnicastro.com
Telephone: (406) 206-5747
Facsimile: (303) 845-9299

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| **BENNETT K. MACINTYRE**, <br><br> Plaintiff, <br><br> v. <br><br> **CARROLL COLLEGE**, **and DOES A-Z**, <br><br> Defendants. | Cause No. <br><br> **COMPLAINT AND JURY DEMAND** |

COMES NOW the Plaintiff, and for his causes of action against Defendant, states as follows:

### PARTIES

1. Plaintiff, BENNETT MACINTYRE, (hereinafter "Plaintiff") is, and was at all times relevant to the allegations contained within this Complaint, a resident of Helena, Montana.

2. Defendant Carroll College is, and at all relevant times was, a Montana private college with its principal place of business in Helena, Montana.

## JURISDICTION AND VENUE

3.     This is a civil rights action arising from Carroll College's violation of Title IX. This action is brought pursuant to 20 U.S.C. § 1681 and 42 U.S.C. § and 1988.

4.     Jurisdiction is founded upon 28 U.S.C. § 1331, 1343(a)(3)-(4), and the aforementioned statutory and constitutional provisions. The amount in controversy herein, excluding interest and costs, exceeds the minimum jurisdictional limit of this Court.

5.     Jurisdiction for declaratory and other relief is invoked pursuant to 28 U.S.C. §§ 2201—2202.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## STATEMENT OF FACTS

7.     On or about July 17, 2006, Mr. MacIntyre was hired by Defendant Carroll College as the Director of Community Living and the Assistant Golf Coach in the athletic department.

8.     In early 2007, Mr. MacIntyre became the Head Golf Coach and continued to be employed as the Director of Community Living.

9.     As compensation for his position as Director of Community Living, Mr. MacIntyre was a full-time employee with a salary and benefits. In addition, Mr. MacIntyre was paid a stipend as the Head Golf Coach.

10.     In 2013, Defendant Carroll College underwent a nationwide search for an Associate Athletic Director. Mr. MacIntyre applied for the job and was selected from nearly 100 applicants for the position. On July 1, 2013, Mr. MacIntyre was hired as the Associate Athletic Director and remained the Head Golf Coach at Carroll College.

11.     As compensation for his position as Associate Athletic Director, Mr. MacIntyre received a salary and the benefits of a full-time employee. Mr. MacIntyre continued as the Head Golf Coach and was paid a stipend.

12.     As Head Golf Coach, Mr. MacIntyre became aware of inequities between women's sports and men's sports at Carroll College. He was provided information including, but not limited to, scholarship funding, participation opportunities and coaching opportunities. These observations were fairly specific to golf, rather than athletics as a whole.

13.     As Associate Athletic Director, Mr. MacIntyre further became familiar with the mandates of Title IX, although he had been provided little or no training from Defendant Carroll College regarding Title IX up to that point.

14.     In his position as Associate Athletic Director, Mr. MacIntyre obtained access to additional information regarding athletics including all coaching salaries, scholarship dollars, budgets for all teams, travel expenses and fundraising. This information indicated a significant disparity between the amount of funding provided to male student-athletes over female student-athletes.

3

15.    As Associate Athletic Director, Mr. MacIntyre was made the executive of the Saints Athletic Association, an organization that raises money for all of Carroll College Athletics.

16.    Although the money raised by the Saints Athletic Association is generally intended for student-athlete scholarships, Defendant Carroll College disproportionately provides scholarships to male student-athletes over female student-athletes with these funds.

17.    At the time Mr. MacIntyre became the Head Golf Coach in 2007, he was the only head coach at Carroll College on a stipend. Since that time Carroll College has added track and field, cross-country, men's soccer and women's softball. All of these other programs hired full-time head coaches with salaries and full benefits.

18.    On May 22, 2015, Mr. MacIntyre was offered and accepted a position to become the full-time Head Golf Coach. This position included salary and full benefits. The position was announced internally in the athletic department and to the Saints Athletic Association. Carroll College underwent a national search to find Mr. MacIntyre's replacement as the Associate Athletic Director, a search it narrowed to two candidates.

19.    On June 22, 2015, Curt Apsey left his position as Athletic Director of Carroll College and Kyle Baker, the Chief of Staff for the President of Carroll College was named the interim Athletic Director. Because Mr. Baker had no experience as an athletic director, Defendant informed Mr. MacIntyre that the

Head Golf Coach position was no longer being offered as Defendant needed Mr. MacIntyre to stay on as the Associate Athletic Director for the transition.

20.     In the fall of 2015, Mr. MacIntyre determined that Defendant Carroll College was out of compliance with the mandates of Title IX regarding funding, spending, and opportunities for female student-athletes at Carroll College.

21.     Defendant, as a university receiving Federal financial assistance, is required by the Office of Civil Rights to designate at least one employee to coordinate efforts to comply with, and carry out, Carroll College's responsibilities under Title IX. Title IX prohibits sex discrimination in education programs and activities, including athletics.

22.     In 2014, Defendant Carroll College designated Renee McMahon the Title IX Coordinator. Ms. McMahon remains the Title IX Coordinator as of the date of this Complaint. Ms. McMahon is the only Title IX Coordinator on Defendant's campus.

23.     Mr. MacIntyre brought his concerns regarding issues with Title IX to Defendant's Director of Human Resources and Designated Title IX Coordinator Renee McMahon in January 2016.

24.     Mr. MacIntyre went to Ms. McMahon in 2016 to voice Title IX concerns, including expenditures, scholarships, coaching, and full-time equivalency, because she was the Designated Title IX Coordinator. Ms. McMahon took notes of the meeting verifying the 2016 complaints made by Mr. MacIntyre.

25.     In his multiple meetings with Ms. McMahon, Mr. MacIntyre informed Defendant's Title IX Coordinator that he had identified violations, potential violations, and concerns regarding Title IX within the athletic department. Ms. McMahon, as Title IX Coordinator, discussed the potential for an internal audit to provide findings and recommendations to Carroll College's administrators.

26.     Ms. McMahon could not perform the audit because, even as Defendant's sole Title IX Coordinator, she acknowledged she is not trained in Title IX athletics and asserted athletics is not within the scope of her position.

27.     After Mr. MacIntyre brought Defendant's Title IX issues to light, Defendant's Title IX Coordinator contacted an independent third-party to conduct an internal Title IX audit for Defendant.

28.     In February 2016, Ms. McMahon received quotes from ATIXA, an independent Title IX consultant, for the cost to have an independent Title IX audit performed at Carroll College. These quotes ranged from $8,000 to $20,000. ATIXA was not retained to perform the Title IX audit nor was any other entity.

29.     After Defendant received the quotes from the independent consultant, it determined that the recently hired and incoming Director of Athletics, Charlie Gross, would perform the audit in-house.

30.     Defendant's Title IX Coordinator asserted that she spoke with incoming Athletic Director, Charlie Gross, to discuss an independent audit by ATIXA and that Mr. Gross represented to Carroll College that he had experience

with Title IX, and he would look into Mr. MacIntyre's complaints when he arrived.

31.    It was determined that Mr. Gross would make an analysis of Title IX compliance at Carroll College a priority upon his arrival.

32.    Defendant represented in emails discussing the audit that it was "happy" that Mr. Gross could cover the Title IX audit and that it would not have to spend the money on an independent audit.

33.    Defendant represented that it would keep Mr. MacIntyre informed of the progress of the audit and inform him of the findings and conclusions of that analysis.

34.    In a memo copied to the incoming athletic director, Charlie Gross and Defendant's Vice President of Finance & Administration, Lori Peterson, Ms. McMahon represented to Mr. MacIntyre that Mr. Gross had experience with Title IX compliance and that Carroll College would make a Title IX analysis a priority.

35.    Prior to raising the Title IX issues with Interim Athletic Director Baker and Ms. McMahon, Mr. MacIntyre had never received a negative evaluation for any position in the near decade of his employment at Carroll College or in the athletic department.

36.    Following his reporting of Title IX issues and the assurances Defendant would engage in an audit to review Mr. MacIntyre's complaints and concerns, Mr. MacIntyre received his first, and only negative employment review from the outgoing Interim Athletic Director, Kyle Baker.

37.    On March 2, 2016, the day prior to being relieved of his position, Interim Athletic Director, Kyle Baker submitted a Performance Appraisal of Mr. MacIntyre in response to Mr. MacIntyre's September 5, 2015 self-assessment. This was the only written assessment Mr. Baker ever provided to Mr. MacIntyre. The Performance Appraisal indicated that Mr. MacIntyre did not meet expectations in any one of the eleven categories provided on the form. Mr. Baker also assessed Mr. MacIntyre by rating him with the lowest marks available on the form. Mr. Baker failed to complete the remaining portion of the evaluation, leaving the rest of it blank.

38.    The following day, Defendant Carroll College offered Mr. MacIntyre a two-year contract as the full-time Head Golf Coach, with salary and full benefits.

39.    Separate and apart from the offer as a full-time Head Golf Coach, Carroll College continued to acknowledge that it planned a thorough analysis of the Title IX concerns that Mr. MacIntyre brought forward as well as a full-scope analysis of the athletics' budgets, including the golf program budget.

40.    Despite the reduction in pay from his position as Associate Athletic Director, on July 26, 2016, Mr. MacIntyre signed an Employment Contract as the Head Golf Coach. The contract provided Mr. MacIntyre would be paid a salary of $38,031.60 per year and in the same manner as all full-time staff members of Carroll College are compensated. The Employment Contract maintained the same

benefits he had always held as a full-time employee. The Employment Contract was for a term of July 1, 2016, through June 30, 2018.

41.     In making Mr. MacIntyre the full-time Head Golf Coach, Defendant Carroll College acknowledged that the student-athletes deserve a full-time coach devoted to the program, just like every other sport at Carroll College and that the move was made with the student-athletes in mind.

42.     Again, during the term of his contract, Mr. MacIntyre did not receive any negative reviews from the Athletic Director or any other supervisor at Carroll College.

43.     In over twelve (12) years as the Head Golf Coach at Carroll College, Mr. MacIntyre never received a complaint from another coach or school.

44.     In over twelve (12) years as the Head Golf Coach at Carroll College, Mr. MacIntyre never received a complaint from a fellow coach, athletic trainer, athletic director, or anyone in the athletic department at Carroll College.

45.     In over twelve (12) years as the Head Golf Coach at Carroll College, Mr. MacIntyre has had many student athletes receive academic all-conference awards, team academic awards, and all-conference player recognition. In addition, his teams routinely obtained some of the highest GPA's in the Carroll College's athletic department. His teams have been nationally ranked and made appearances at the NAIA National Championships.

46.    In the Spring of 2018, Athletic Director Gross informed Mr. MacIntyre that his contract as full-time Head Golf Coach would not be renewed due to budgetary constraints.

47.    Despite the success of the golf program, on June 28, 2018, Athletic Director Gross confronted Mr. MacIntyre with a Golf Stipend Agreement. The Stipend Agreement cut Mr. MacIntyre's pay by more than half, to $14,000 per year. The Stipend Agreement terminated all of Mr. MacIntyre's benefits, including healthcare, which he had held since 2006.

48.    The position description for stipend Head Golf Coach remained identical as the time period Mr. MacIntyre was a full-time employee. Both Mr. Gross and Ms. McMahon acknowledged the description of the position remained the same.

49.    The responsibilities of the position, however, increased. Now, they included a required number of participants and written practice plans and workout plans.

50.    No other coach at Carroll College is required to submit written practice plans or workout plans. Mr. MacIntyre is the only coach with these requirements.

51.    Although the position increased in terms of the responsibility to maintain twenty participants, Defendant did not increase the scholarship support for golf, which remains at less than one full scholarship to share between the men's and women's teams. The NAIA limit for scholarships in golf is five (FGE)

for the men's golf program and five (FGE) for the women's golf program. Carroll College provides approximately 0.9 of one total scholarship for the entire program to be split evenly between men and women, despite the fact that women make up a proportionately greater part of the student population than men.

52.     Although the position increased the responsibility to maintain twenty participants, Defendant did not provide any additional recruiting dollars and the golf recruiting budget remained at $0.00. Golf is the only sport at Carroll College without a recruiting budget.

53.     Defendant represented to Mr. MacIntyre that he was cut from a full-time Head Golf Coach to a "stipend" position as a result of budget cuts within the athletic department.

54.     Mr. MacIntyre is the only coach in the history of Carroll College athletics to be dropped from a full-time coach to a stipend coach.

55.     Mr. MacIntyre was not offered any other position at Carroll College which would allow him to maintain his full-time employment status. While other coaches were given jobs within the athletic department to supplement their salaries, Mr. MacIntyre was not provided the same opportunity.

56.     On a number of occasions, Mr. Gross denied Mr. MacIntyre's request and the requests from a number of other programs to start a booster club to raise additional funds, although the football team, men's basketball team, and women's basketball team were allowed to do so.

57.    Defendant moved Mr. MacIntyre from his office in the athletic department to a cubicle in the football stadium. Mr. MacIntyre is the only head coach in a cubicle and the only head coach without a secure office.

58.    Golf accounted for a disproportionate amount of the budget adjustments. Cuts to Mr. MacIntyre's salary and benefits amounted to 42% of the total cuts to staff and employees. The other two positions that had salary reductions, remained full-time employees and maintained their benefits.

59.    On June 28, 2018, Mr. MacIntyre filed an Equal Opportunity Grievance Procedure with Carroll College. In Claim One of his grievance, Mr. MacIntyre asserted retaliation for his multiple requests to Defendant for compliance with Title IX. Mr. MacIntyre submitted his grievance to the President of Carroll College as is consistent with policy. The grievance was sent back to the Title IX Coordinator to investigate a grievance in which she was directly involved.

60.    In investigating Mr. MacIntyre's grievance, Defendant retained Jim Kerins to perform an investigation that Defendant Carroll College alleged was independent. Jim Kerins is an alumnus of Carroll College and the son of a former Carroll College President.

61.    Despite Mr. MacIntyre's primary grievance claim of Title IX retaliation, Defendant hired an individual, Mr. Kerins, with no experience with Title IX, and who affirmatively disclosed in his final report that he had never

performed a Title IX investigation, was not qualified to conduct a Title IX investigation and did not look into any potential Title IX issues at Carroll College.

62.     Mr. Kerins report verified the following regarding Defendant:

a.     Mr. Gross acknowledged that he is not a Title IX expert and would not know whether a Title IX problem exists;

b.     Mr. Gross asserted that Defendant never made Title IX a priority and never gave him any indication that Title IX was a priority;

c.     Defendant never asked Mr. Gross to perform a Title IX analysis;

d.     Mr. Gross, in his experience, was unaware of any institution doing their own Title IX analysis and if Defendant talked about it, they never followed through with it;

e.     Mr. Gross confirmed that he never discussed or prioritized Title IX with Dr. Evans;

f.     Despite Mr. Gross' acknowledgment of his lack of Title IX experience, Ms. McMahon asserted that Mr. Gross represented that he had expertise in Title IX, spoke with confidence about his Title IX experience and gave her confidence that the Title IX complaints were in good hands;

g.     Ms. McMahon, as the Title IX Coordinator for Defendant, did not know how to ensure Mr. Gross would follow through on

the promise to address Mr. MacIntyre's Title IX complaints and concerns;

h.    Ms. McMahon did not know what happened with the Title IX review by Mr. Gross, did not know the status of the review and does not know if Mr. Gross and Dr. Evans ever spoke about Title IX or making it a priority;

i.    Ms. McMahon did not follow up in any manner regarding the Title IX issues or the complaints and concerns brought to her by Mr. MacIntyre regarding the athletic department;

j.    Ms. McMahon, as the Title IX Coordinator, did not believe that following up on Title IX complaints, compliance or analysis was within the scope of her Title IX work;

k.    Ms. McMahon, even to this day, does not know what experience or qualifications Mr. Gross has in regard to Title IX, Title IX compliance or Title IX analysis;

l.    As the Title IX Coordinator for Defendant Carroll College, Ms. McMahon did not verify or inquire into Mr. Gross' Title IX experience or expertise;

m.    Even as the Title IX Coordinator, Ms. McMahon does not provide any athletic specific Title IX training nor does she disclose to the coaches or the student-athletes what the institution must do to follow and comply with Title IX so they

14

would have the knowledge to file a complaint or observe and report wrongdoing;

n.   Mr. Gross verified that Defendant does not provide athletic coaches any training or information on athletic Title IX compliance;

o.   Based on statements by Mr. Gross and Ms. McMahon, no one employed by Defendant is responsible or oversees Title IX athletic issues, complaints, education, or information in the athletic department;

p.   Ms. McMahon, as the Director of Human Resources, recognizes that it is not common practice to move an employee from a full-time contracted employee to a stipend employee;

q.   Ms. McMahon recognized that the change in employment for Mr. MacIntyre was a termination and even offered to assist Mr. MacIntyre obtain unemployment;

r.   The coaches interviewed by Mr. Kerins viewed moving Mr. MacIntyre from a full-time position to a stipend position as a termination;

s.   No coach interviewed by Mr. Kerins had ever heard of a coach being reduced from full-time to stipend at Carroll College or any other institution where they had previously coached;

t.    Ms. McMahon scheduled, and had an H.R. assistant perform an exit interview with Mr. MacIntyre, as she would with any terminated employee;

u.    Mr. MacIntyre continued to bring up his Title IX concerns and Carroll College documented those concerns in the exit interview; and,

v.    Mr. Gross does not confer with the Title IX Coordinator prior to making budget decisions or cuts, scholarship decisions, or staffing decisions in the department of Athletics.

63.    In summarizing his report, Mr. Kerins recommended that the College should develop a plan to follow-through on its commitment to conduct a Title IX review as specified in the February 23, 2016 memo from Ms. McMahon to Mr. MacIntyre.

64.    Mr. Kerins recommended that having the Athletic Director and Title IX Coordinator conduct an internal review in a timely manner may be an effective approach to meeting the commitment to perform a Title IX audit or review.

65.    Neither Athletic Director Gross or Title IX Coordinator McMahon are qualified or capable to conduct an internal Title IX audit or review of the athletic department.

66.    Defendant did not follow the recommendations of Mr. Kerins.

67.    Since Mr. Gross' hiring, Carroll College has not conducted any analysis of Title IX in the athletic department and consequently has not and

16

cannot inform Mr. MacIntyre as to any findings or recommendations regarding a Title IX audit.

68.     At no time did Defendant perform a Title IX audit or investigate Mr. MacIntyre's Title IX complaints as it had promised him.

69.     The only time that Defendant took any action regarding Title IX was after Defendant's Women's Softball team, through legal counsel and the threat of litigation, made Title IX complaints to Carroll College. When those complaints were lodged in late 2018, Defendant hired legal counsel, not an independent consultant, to review those Title IX complaints.

70.     Defendant still has not performed an independent audit to review its Title IX compliance or lack thereof.

71.     Early in 2019, during the Program Prioritization process, Mr. MacIntyre submitted his report on time and as directed by Mr. Gross. The report submitted by Mr. MacIntyre again addressed gender disparities and Title IX issues.

72.     After Mr. MacIntyre submitted his final report as directed to Mr. Gross, the report was changed to remove any mention of Title IX concerns, issues, complaints, or observations. Mr. Gross then submitted the sanitized report to the Program Prioritization Committee representing it was Mr. MacIntyre's final report.

73.     When Mr. MacIntyre later reviewed the final report submitted by Mr. Gross online and publicly available to any Carroll College employee, he became aware that all references to Title IX had been omitted.

74.     After bringing the changes to the attention of the Program Prioritization Committee Chairs, Cathy Day and Lori Peterson, a meeting was held to discuss the report. In that meeting and in response to the removal of references to Title IX, Ms. Peterson asked Mr. MacIntyre, "do you think this really makes a difference." As his basis for the removal of the references to Title IX, Mr. Gross stated, "you can't measure sexual discrimination."

75.     Ultimately, and only because Mr. MacIntyre brought it to the attention of others, the report was changed back to Mr. MacIntyre's original version. Mr. Gross approved the report in its entirety, including Mr. MacIntyre's references to Title IX problems and concerns.

76.     Two weeks after his meeting with Mr. Gross to discuss the sanitation of the Title IX concerns and complaints in the report, the Golf Program was put in the 5th (lowest) Quintile. This meant that the Golf Program was under consideration to be eliminated.

77.     Mr. MacIntyre experienced and continues to experience retaliation for bringing Title IX concerns and complaints to Carroll College.

78.     Carroll College engages in deliberate indifference to Title IX complaints, concerns, and problems when they are bought to its attention.

## COUNT I
## TITLE IX – RETALIATION
### (20 U.S.C. § 1681)

79.     Plaintiff realleges and restates the allegations contained within paragraphs 1 through 78.

80.     No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

81.     Defendant Carroll College receives Federal funding and financial assistance and is subject to the mandates of Title IX.

82.     Title IX's private right of action encompasses claims of retaliation against an individual because he or she has complained about sex discrimination.

83.     When a funding recipient such as Defendant Carroll College retaliates against a person because he complains of sex discrimination, this constitutes intentional discrimination on the basis of sex, in violation of Title IX.

84.     In order to comply with Title IX, schools must provide equal athletic opportunities in three general areas: (1) scholarships, (2) equivalent participation opportunities and (3) equal treatment and benefits.

85.     To the extent that an educational institute provides scholarship funding, it must provide reasonable opportunities for such awards for members of each sex in proportion to the numbers of students of each sex participating in intercollegiate athletics.

86.     Mr. MacIntyre brought documented complaints and concerns to Defendant's Title IX Coordinator so that Defendant might address those issues.

87.     Those complaints and concerns included disparate scholarship spending, participation opportunities, treatment, benefits, funding, resources, and employment opportunities based on sex.

88.     Mr. MacIntyre made both written and verbal complaints to the Defendant on numerous occasions from 2015 through his termination in 2018.

89.     Defendant did not do anything to investigate those complaints or concerns.

90.     As a result of bringing Title IX complaints and concerns to Defendant, Mr. MacIntyre suffered an adverse action.

91.     Mr. MacIntyre was terminated, his new position provided a salary amounting to less than half his previous full-time employment, his benefits were cut, he was moved out of his office, he was given additional coaching responsibilities, he was not allowed to fundraise and was told to keep quiet regarding his termination.

92.     Had Mr. MacIntyre not voiced his concerns and complaints to Defendant, he would not have been terminated or demoted or suffered any of the other adverse actions initiated by Defendant.

93.     Defendant's assertion that Mr. MacIntyre was terminated due to budgetary considerations is merely a pretextual excuse for retaliation.

94.    Mr. MacIntyre has suffered significant damages as a result Defendant's Title IX retaliation and is entitled to compensatory and punitive damages.

## COUNT II
## WRONGFUL DISCHARGE – RETALIATION
## (MONT. CODE ANN. § 39-2-904(a))

95.    Plaintiff realleges and restates the allegations contained within paragraphs 1 through 94.

96.    A discharge is wrongful under Montana law if it was in retaliation for the employees' refusal to violate public policy or for reporting a violation of public policy.

97.    Title IX prohibits the exclusion from participation, denial of benefits or discrimination under any education program on the basis of sex. This public policy is inherent to the fundamental right that we are all created equal.

98.    In 2016, Mr. MacIntyre brought Title IX concerns and complaints to Defendant's designated Title IX Coordinator.

99.    Prior to bringing Title IX concerns and complaints to Defendant, Mr. MacIntyre had never received a negative performance review, had worked his way up to the position of Associate Athletic Director, had an office, and had enjoyed the salary and benefits of a full-time employee for nearly a decade.

100.    After Mr. MacIntyre identified Title IX issues and brought those to the attention of his employer for the benefit of the student-athletes, Defendant took the following actions:

a.   Defendant terminated Mr. MacIntyre's employment as a full-time employee;

b.   Defendant offered Mr. MacIntyre a new position as a stipend position that reduced his salary by more than 50%;

c.   Defendant cut all Mr. MacIntyre's benefits, including health care and retirement;

d.   Defendant removed Mr. MacIntyre from his office and moved him to a cubicle in a different building;

e.   Defendant increased Mr. MacIntyre's responsibilities and expectations as a stipend coach.

f.   Defendant imposed mandates on Mr. MacIntyre that no other stipend coach was required to follow;

g.   Defendant required a roster size of twenty (20) athletes, without providing the golf program any funding for recruiting and providing less than one full scholarship to split between men and women;

h.   Defendant prevented Mr. MacIntyre from raising money through a booster club to better his program, while other programs, specifically football, men's basketball, and women's basketball were permitted to have those clubs;

i.   Defendant changed Mr. MacIntyre's reports to the administration to sterilize any mention of Title IX issues, complaints, or concerns; and,

j.   Defendant put Mr. MacIntyre's program in the lowest quintile for evaluation.

101.   Although Defendant spent a significant amount of time retaliating against Mr. MacIntyre, it did not devote any time to following up on the Title IX concerns and complaints that Mr. MacIntyre brought to the athletic department as early as 2015 and certainly by 2016. Even now, Defendant cannot verify or deny whether the Title IX concerns are valid.

102.   Defendant Carroll College retaliated against Mr. MacIntyre for bringing Title IX concerns to its attention.

103.   Mr. MacIntyre's conduct is protected under Montana's Wrongful Discharge from Employment Act because he is an employee as defined in Mont. Code Ann. § 39-2-903(3), and a discharge in retaliation for reporting a violation of public policy is a wrongful discharge under Mont. Code Ann. § 39-2-904.

104.   Defendant engaged in actual malice and actual fraud in the discharge of Mr. MacIntyre in violation of Mont. Code Ann. § 39-2-904(1)(a).

105.   Mr. MacIntyre is entitled to lost wages and fringe benefits, interest upon lost wages and fringe benefits, and punitive damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.    An order declaring that Defendant Carroll College violated the Plaintiff's rights under Title IX by retaliating against him;

B.    Injunctive relief reinstating Plaintiff to his position as a full-time employee and Head Golf Coach;

C.    An order restraining Defendant, its officers, agents, employees, and successors from future harassment, discrimination, or retaliation against Plaintiff;

D.    An award of compensatory damages and monetary relief permitted by Title IX and other applicable law, including but not limited to, the loss of past and future wages, past and future fringe benefits and emotional distress damages suffered by Plaintiff as a result of Defendant's retaliatory actions;

E.    Reasonable attorney fees, expert witness fees, and expenses pursuant to 42 U.S.C. § 1988;

F.    Punitive Damages for retaliation under Mont. Code Ann. § 39-2-905 and Title IX.

G.    Any such other and further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a jury trial.


DATED this 21st day of June, 2019

                         KNIGHT NICASTRO MACKAY, LLC


                     By:  */s/ Dylan McFarland*
                           Dylan McFarland
                           *Attorney for Defendant*