Marcia Davenport
John M. Semmens
CROWLEY FLECK PLLP
900 North Last Chance Gulch,
Suite 200
P.O. Box 797
Helena, MT 59624-0797
Telephone: (406) 449-4165
Facsimile: (406) 449-5149
Email:  mdavenport@crowleyfleck.com
         jsemmens@crowleyfleck.com

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MONTANA

## HELENA DIVISION

|  |  |
|---|---|
| BENNETT K. MACINTYRE, | Cause No.  CV-19-42-H-SEH |
| Plaintiff, | |
| v. | **CARROLL COLLEGE'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| CARROLL COLLEGE, | |
| Defendant. | |

# **TABLE OF CONTENTS**

SUMMARY JUDGMENT STANDARD ................................................................1

SUMMARY OF ARGUMENT ...........................................................................2

ARGUMENT .....................................................................................................5

   I.    MACINTYRE CANNOT MEET HIS BURDEN TO ESTABLISH HIS
       PRIMA FACIE CASE OF TITLE IX RETALIATION.........................5

      A.   MacIntyre Cannot Show He Engaged In A Protected Activity .......6

      B.   MacIntyre's Rule 36 Admission That Carroll Has No Contractual
          Obligation To Renew His One-Time Contract Is An Admission
          That Nonrenewal Is Not Retaliation .................................................9

      C.   MacIntyre Cannot Establish A Causal Link Between Any Alleged
          Protected Activity And Alleged Retaliatory Action ......................11

  II.   CARROLL HAS LEGITIMATE, NON-RETALIATORY REASONS
       FOR ITS ACTIONS ............................................................................13

      A.   MacIntyre's Employment Contract Was Not Renewed Due To
          $1.2 Million In Campus-Wide Budget Cuts ..................................13

          1.   In 2017, Due To Declining Student Enrollment, Carroll's
              Budget Committee Anticipated A $1.2 Million Shortfall In
              Fiscal Year 2018/19................................................................13

          2.   Athletic Director Gross Identified $198,753 Of The
              $218,152.96 In Athletics' Budget Cuts To The Budget
              Committee On August 8, 2017................................................15

          3.   Gross Identified Budget Cuts That Would Minimize The
              Impact On The Students .........................................................15

          4.   Gross Presented Options For Additional Cuts To The Budget
              Committee On January 17, 2018.............................................16

5.   Gross Recommended On January 24, 2018 The Full-Time
     Head Golf Coach Contract Position Be Returned To Its
     Historic Stipend Position.........................................................16

6.   On March 16, 2018, The Budget Committee Recommended
     Budget Cuts To The Carroll President, Including Returning
     The Full-Time Head Golf Coach Contract Position To Its
     Historic Stipend Position.........................................................17

7.   The Trustees Approved The Budget On May 11, 2018.........18

B.   Carroll Has Legitimate, Non-Discriminatory Reasons For The
     Other Alleged Acts Of Retaliation..................................................19

     1.   MacIntyre Relocated His Office From The Administrative
          Office Area Seven Months After He No Longer Had
          Administrative Duties............................................................20

     2.   The Head Golf Coach Position Is A Part-Time Position.......20

     3.   Booster Club Money .............................................................21

     4.   Submission Of Program Information Report.........................22

     5.   Golf Program in Lowest Quintile...........................................22

III.  MACINTYRE CANNOT MEET HIS BURDEN TO SHOW
      CARROLL'S REASONS ARE BOTH FALSE AND THE REAL
      REASON IS RETALIATION .............................................................23

IV.  CARROLL IS ENTITLED TO SUMMARY JUDGMENT ON
     MACINTYRE'S INDIVIDUAL EMPLOYMENT CLAIMS WHICH
     HE RELEASED IN HIS 2016 SETTLEMENT ...................................24

     A.   This Court Has Jurisdiction To Enforce Macintyre's 2016
          Settlement Where He Released The Same Claims He Reasserts In
          His Amended Complaint..................................................................24

     B.   MacIntyre Released Any And All Individual Employment Claims
          In His 2016 Settlement...................................................................25

iii

V.    MACINTYRE'S CLAIMS WHICH ACCRUED ON OR BEFORE
      JUNE 21, 2016 ARE BARRED BY THE THREE-YEAR STATUTE
      OF LIMITATIONS.................................................................................28

VI.   MACINTYRE HAS NO DAMAGES FOR HIS PURPORTED LOSS
      OF THE TUITION REMISSION/EXCHANGE BENEFIT FOR HIS
      CHILDREN ..........................................................................................29

CONCLUSION.......................................................................................................30

CERTIFICATION OF COMPLIANCE ..................................................................31

# TABLE OF AUTHORITIES

**Cases**                                                                                                 **Page**

*B.D. By and Through Deming v. Deming,*

    2020 MT 205N, 468 P.3d 815, 401 Mont. 556  ............................................25

*Burch v. Regents of Univ. of Cal.,*

    433 F. Supp. 2d 1110 (E.D. Cal. 2006) ....................................................... 7-9

*Celotex Corp. v. Catrett,*

    477 U.S. 317, 106 S. Ct. 2548 (1986) ............................................................2

*Clark Cty. Sch. Dist. v. Breeden,*

    532 U.S. 268 (2001)......................................................................................11

*Dugas v. Lockheed Martin Corp.,*

    725 Fed. App'x. 573 (9th Cir. 2018)............................................................24

*Emeldi v. Univ. of Or.,*

    698 F.3d 715 (9th Cir. 2012) ...................................................................5, 24

*Gebser v. Lago Vista Indep. Sch. Dist.,*

    524 U.S. 274 (1998)........................................................................................7

*Hinderman v. Krivor,*

    244 P.3d 306 (Mont. 2010)..........................................................................25

*Howard University v. Lacy,*

    828 A.2d 733 (D.C. 2003) ...........................................................................29

*In re Suchy*,

    786 F.2d 900 (9th Cir. 1985) ...........................................................25

*Jackson v. Birmingham Bd. of Educ.*,

    544 U.S. 167 (2005)...........................................................................5

*Jones v. Montana State University*,

    2020 MT 299N, 475 P.3d 763 (Mont. Nov. 24, 2020)...........................10, 11

*Keyser v. Sacramento City Unified Sch. Dist.*,

    238 F.3d 1132 (9th Cir. 2001) ..............................................11, 12

*Kohler v. Bed Bath & Beyond of California, LLC*,

    778 F.3d 827 (9th Cir. 2015) .............................................................1

*Kokkonen v. Guardian Life Ins. Co. of Am.*,

    511 U.S. 375 (1994)...........................................................24, 25

*Kraft v. High Country Motors, Inc.*,

    2012 MT 83, 276 P.2d 908, 364 Mont. 465 ...................................29

*Manatt v. Bank of Am.*,

    339 F.3d 792 (9th Cir. 2003) ...........................................................11

*Minnis v. Bd. of Sup'rs of La. State Univ.*,

    55 F. Supp. 3d 864 (M.D. Louis. 2014) ............................................8

*Nguyen v. Regents of Univ. of California*,

    823 F. App'x 497 (9th Cir. 2020) .....................................................8

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*,

    210 F.3d 1099 (9th Cir. 2000) ....................................................................1, 2

*Owen Equipment & Erection Co. v. Kroger*,

    437 U.S. 365 (1978)........................................................................................25

*Peacock v. Thomas*,

    516 U.S. 349 (1996)........................................................................................25

*Pratt v. State of Haw.*,

    No. 17-00599DKW-RLP, 2019 WL 1548570, (D. Haw. Apr. 9, 2019).......11

*Richmond v. ONEOK, Inc.,*

    120 F.3d 205 (10th Cir. 1997) ......................................................................11

*St. Mary's Honor Ctr. v. Hicks*,

    509 U.S. 502 (1993)........................................................................................24

*Scott v. Mabus*,

    618 F. App'x 897 (9th Cir. 2015) ....................................................................8

*Stanley v. Trs. of Cal. State Univ.*,

    433 F.3d 1129 (9th Cir. 2006) ......................................................................28

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*

    570 U.S. 338 (2013)........................................................................................24

*Weaver v. Ohio State Univ.*,

    71 F. Supp. 2d 789 (S.D. Ohio 1998)..............................................................8

**Rules**

Fed. R. Civ. P. 36 ................................................................................2, 3, 9

Fed. R. Civ. P. 56 ...................................................................................1, 2

**Statutes**

20 U.S.C. § 1681 ......................................................................................5

20 U.S.C. § 1682 ......................................................................................7

Montana Code Annotated § 27-2-204 ....................................................28

Carroll College ("Carroll") submits this Brief in Support of its Motion for Summary Judgment.  For the reasons set forth below, Carroll respectfully requests the Court grant its motion.

## SUMMARY JUDGMENT STANDARD

"Summary judgment should be granted if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Kohler v. Bed Bath & Beyond of California, LLC*, 778 F.3d 827, 829 (9th Cir. 2015) (quoting Fed.R.Civ.P. 56(a)).

"A moving party without the ultimate burden of persuasion at trial . . . has both the initial burden of production and ultimate burden of persuasion on a motion for summary judgment."  *See e.g.*, *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc*., 210 F.3d 1099, 1102 (9th Cir. 2000) (citations omitted).  To meet the initial burden, "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Id*.  (citation omitted).

If "a moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Id*.  (citation omitted).  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."  *Id*.

1

(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986)

("Rule 56(c) mandates the entry of summary judgment, after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which

that party will bear the burden of proof at trial.")).

## SUMMARY OF ARGUMENT

Bennett MacIntyre ("MacIntyre"), the current Carroll Men's and Women's

Head Golf Coach (in a stipend position), cannot establish the three elements of his

prima facie Title IX retaliation claim, i.e.—that he engaged in protected activity,

suffered an adverse action, and there was a causal link between the two.

First, MacIntyre lacks sufficient proof of a "protected activity."  He cannot

show his Title IX concerns reported in 2016 were based on sex discrimination.

His reported concerns in 2016 were about scholarships, staffing, and funding of

Carroll's Men's and Women's Golf Programs with no indication his claims were

based on sex discrimination.

Second, MacIntyre did not suffer an adverse action when his one-time,

two-year, full-time Head Golf Coach Employment Contract ("one-time contract"

or "Employment Contract") was not renewed when it expired on June 30, 2018.

MacIntyre's Rule 36 (Fed.R.Civ.P.) admission that Carroll had no contractual

obligation to renew his Employment Contract is dispositive that the nonrenewal is

2

not retaliation.  His Rule 36 admission applies to two contracts:  the parties'
April 13, 2016 Settlement Agreement and Release ("2016 Settlement") and the
Employment Contract (July 1, 2016-June 30, 2018).  The 2016 Settlement, which
requires only one Employment Contract, includes a "No Retaliatory Action" clause
whereby Carroll agrees "it will take no retaliatory action against MacIntyre for
raising the claims that are the subject of the agreement."  MacIntyre's claim that he
should be the full-time Head Golf Coach to comply with Title IX became the
subject of his 2016 Settlement.  MacIntyre's Rule 36 admission that Carroll had no
contractual obligation to renew his Employment Contract is an admission Carroll
had no contractual obligation to renew it under the 2016 Settlement's
"No Retaliatory Action" clause.  Nonrenewal is therefore not a retaliatory action.
MacIntyre also agreed the 2016 Settlement, which requires only the one
Employment Contract, sets forth the complete understanding of the parties.
Further, Montana law applies to both contracts and under Montana law a non-
tenured coach does not generally have a legitimate expectation of contract renewal.

Third, MacIntyre cannot establish a causal link between any purported
protected activity and any alleged retaliatory action.  The temporal proximity must
be "very close" between the two—the U.S. Supreme Court and Ninth Circuit
support a gap of three months is insufficient to establish a causal link.

If MacIntyre could establish his prima facie case (he cannot), Carroll has legitimate, non-discriminatory reasons for not renewing his one-time contract. Carroll's student enrollment declined, resulting in $1.2 million in budget cuts to meet the budget shortfall in fiscal year 2018/19, including a reduction of 15 full-time equivalent ("FTE") positions campus wide. (The budget shortfall now exceeds $4.6 million with a reduction of 23 FTEs.) Due to budget cuts, Carroll did not renew MacIntyre's one-time contract and instead returned the Head Golf Coach position to a stipend position as the Men's and Women's Golf Programs were successfully managed from 2006–2016 with a Head Golf Coach in a stipend position. MacIntyre cannot show Carroll's reasons are pretext.

Carroll is also entitled to summary judgment on all claims MacIntyre released and discharged in his 2016 Settlement, and those claims are barred by the three-year statute of limitations for Title IX retaliation claims.

Last, Carroll is entitled to summary judgment on MacIntyre's speculative damages claim for the value of the tuition remission benefit for his children, ages 2 and 6. The benefit is conditional on Carroll's financial situation. There is no way to know if it will be available in another 13 and 16 years respectively if his children attend college. MacIntyre has no financial loss related to the value of the tuition remission benefit given the increase in his earnings capacity at St. Peter's Health compared to Carroll. MacIntyre may also obtain other full-time

4

employment at Carroll, become re-eligible for the benefit, and use it if it still exists when (and if) his children attend college.

## ARGUMENT

### I.     MACINTYRE CANNOT MEET HIS BURDEN TO ESTABLISH HIS PRIMA FACIE CASE OF TITLE IX RETALIATION.

Title IX provides, in part, "[n]o person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a) (emphasis added); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (implied right of action exists under Title IX for retaliation against a person who has complained of *sex discrimination*).

In deciding Title IX retaliation claims, the Ninth Circuit applies the same "familiar framework used to decide retaliation claims under Title VII."  *See Emeldi v. Univ. of Or.,* 698 F.3d 715, 724 (9th Cir. 2012) (internal quotation marks omitted) (footnote omitted), *cert. denied,* 569 U.S. 947 (2013).

> In this framework, a plaintiff who lacks direct evidence of retaliation must first make out a prima facie case of retaliation by showing (a) that he or she was engaged in protected activity, (b) that he or she suffered an adverse action, and (c) that there was a causal link between the two.

*Id*. at 724 (citation omitted).  MacIntyre cannot meet his burden.

## A.  MacIntyre Cannot Show He Engaged In A Protected Activity.

MacIntyre reported his perceived Title IX concerns about Carroll's Men's and Women's Golf Program ("Golf Program") to Title IX Coordinator Renee McMahon ("McMahon") on January 29, 2016 related to recruitment money, scholarships, staffing, expenditures, and booster club money—not sex discrimination.  (SUF¶¶31-34).  On February 10, 2016, McMahon summarized MacIntyre's purported Title IX concerns as "some potential violations of Title IX provisions within the department of Athletics," which MacIntyre agreed was "accurate" on February 15, 2016.  (SUF¶¶40-43).  On February 23, 2016, McMahon informed MacIntyre that incoming Athletic Director Charlie Gross ("Gross") would make analysis of Title IX a priority.  (SUF¶46).  On February 24, 2016, MacIntyre requested full-time employment related to his Title IX concerns and a budget comparable to other athletic teams for telephone long distance, recruitment, travel, copying, supplies, and gear/wear in addition to an increase in scholarships for the Golf Program.  (SUF¶¶47-49).  There is no mention of sex discrimination or gender inequity in any communications between McMahon and MacIntyre on February 10, 23, 24, or March 3, 2016.  (SUF¶¶43,45,52).

MacIntyre's alleged Title IX concerns raised to Athletic Director Gross were about Carroll's treatment of the Golf Program as a whole and how current operations work within athletics, including funding of scholarships, staffing, and

the inadequacy of travel dollars for golf.  (SUF¶¶63-67).  MacIntyre has never communicated concerns to Gross in the context of sex discrimination.  (SUF¶¶68-69;237-238).

Neither McMahon nor Gross interpreted MacIntyre's perceived Title IX concerns about the Men's and Women's Golf Program as based on sex discrimination or gender inequity.  (SUF¶¶36,69,237).

On November 17, 2017, MacIntyre told William War ("War"), in War's capacity as a friend and not as a member of the Carroll Board of Trustees ("Trustees"), that Gross did not appreciate Carroll's Golf Program or provide it with sufficient resources.  (SUF¶210).  MacIntyre did not discuss gender equity with War.  (SUF¶212).  MacIntyre's May 10, 2018 email to War generally references "Title IX laws" and "sports inequities," with no mention of sex discrimination or gender inequity.  (SUF¶212).  MacIntyre's alleged report to War is not notice to Carroll as War is not an "appropriate person" to report Title IX concerns as he is not in a position to take corrective action.  *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998) ("'appropriate person' under § 1682 is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination").

A general complaint of a Title IX violation or unfair treatment is not sufficient to establish a protected activity based on sex discrimination.  *Burch v.*

7

*Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110 (E.D. Cal. 2006) (no Title IX claim

for wrestling coach's complaint about lack of separate women's wrestling team);

*Minnis v. Bd. of Sup'rs of La. State Univ.*, 55 F. Supp. 3d 864, 868 (M.D. Louis.

2014) (no Title IX claim for former LSU coach's vehemently objecting to

violations of Title IX, including the condition of on-campus tennis facilities, the

inconvenience of the off-site facilities available to the women's team, and being

paid a salary lower than the men's tennis coach); *Weaver v. Ohio State Univ.*,

71 F. Supp. 2d 789, 793-94 (S.D. Ohio 1998), *aff'd*, 194 F.3d 1315 (6th Cir. 1999)

(plaintiff's complaints about condition of practice field were insufficient to

establish a protected activity where there is no evidence "plaintiff ever framed her

complaints concerning the field in terms of Title IX sex discrimination").

"An employee who engages in a protected opposition activity must indicate

that the opposition is on the basis of a protected ground." *Scott v. Mabus*, 618 F.

App'x 897, 901 (9th Cir. 2015) (citations omitted) (plaintiff never mentioned race

or discrimination in his inquiries to his supervisors regarding the 2006 supervisory

position, and thus, his inquiries into the 2006 position did not constitute a protected

activity); *Nguyen v. Regents of Univ. of California*, 823 F. App'x 497, 502 (9th Cir.

2020) (affirming summary judgment in favor of a college on Title IX retaliation

claim because the complainant's discrimination allegations were "too vague . . . .

to state a prima facie case of retaliation").  A plaintiff may not be required to use

8

"magic words" to establish a protected activity, "but he did have an obligation to 'at least say something to indicate [that gender was] an issue.'"  *Burch* at 1127 (footnote omitted) (citations omitted).

Here, MacIntyre did not communicate his perceived Title IX concerns were based on gender *before* the expiration of his one-time contract.  Carroll's first hint that MacIntyre perceived his Title IX concerns as based on gender was in September 2018 when Carroll received Kerins' report and MacIntyre's September 7, 2018 appeal of it (which he withdrew on September 21, 2018).  (SUF¶193). Carroll pursued retaining an expert to conduct a Title IX athletics' audit to address MacIntyre's concerns on or about September 25, 2018.  (SUF¶194).  Before Carroll had retained an expert, it received an October 3, 2018 Title IX softball claim and retained a Title IX expert to conduct a comprehensive review of the entire Athletic Department.  (SUF¶195).  Gross shared the June 2019 results (but not a copy) of the Title IX expert's comprehensive review with the coaching staff, i.e.—that Carroll's Athletic Department is compliant with Title IX.  (SUF¶¶199-200).

### B.   MacIntyre's Rule 36 Admission That Carroll Has No Contractual Obligation To Renew His One-Time Contract Is An Admission That Nonrenewal Is Not Retaliation.

MacIntyre's Rule 36 admission that Carroll had no contractual obligation to renew his "one-time, two-year, full-time employment contract as Head Golf Coach

when it expired on June 30, 2018" applies to two contracts: (1) the 2016

Settlement; and (2) the Employment Contract.  (SUF¶¶73,84,86).

The 2016 Settlement includes a "No Retaliatory Action" clause whereby

Carroll agrees "it will take no retaliatory action against MacIntyre for raising the

claims that are the subject of the agreement," and that "MacIntyre shall be entitled

to all remedies allowed in law or equity resulting from retaliatory action taken by

the College."  (SUF¶81).  One claim MacIntyre raised that became a subject of his

2016 Settlement is his contention he should be the full-time Head Golf Coach to

comply with Title IX.  (SUF¶48).  In the 2016 Settlement, Carroll and MacIntyre

agreed Carroll would employ MacIntyre as full-time Head Golf Coach for two

years.  (SUF¶231).  MacIntyre's admission that Carroll had no contractual

obligation to renew his one-time contract is an admission Carroll had no obligation

to renew it under the 2016 Settlement's "No Retaliatory Action" clause.

Nonrenewal of his one-time contract is therefore not retaliation, and MacIntyre has

no remedies "in law or equity" resulting from the nonrenewal.

Further, in this case, the parties agreed both contracts shall be governed by

Montana law.  (SUF¶¶92,233).  In Montana, a non-tenured college employee does

not generally have a legitimate expectation of a contract renewal.  *Jones v.*

*Montana State University,* 2020 MT 299N, 475 P.3d 763 (Table), *2 (Mont.

Nov. 24, 2020) (citations omitted).  MacIntyre must have more than a unilateral

expectation to continued employment. *Id*. MacIntyre agreed the 2016 Settlement sets forth the complete understanding of the parties. (SUF¶80). The complete understanding is a one-time contract. During Gross's tenure, three coaches' contracts were not renewed. (SUF¶295).

### C.   MacIntyre Cannot Establish A Causal Link Between Any Alleged Protected Activity And Alleged Retaliatory Action.

In the Ninth Circuit, a "causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and adverse action." *Pratt v. State of Haw.*, No. 17-00599DKW-RLP, 2019 WL 1548570, at *6 (D. Haw. Apr. 9, 2019) (citations omitted). Courts "that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality . . . uniformly hold that the temporal proximity must be 'very close.'" *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (three-month lapse too long); *see also Manatt v. Bank of Am.*, 339 F.3d 792, 802 (9th Cir. 2003). "[T]ime ranging from 42 days up to three months has been found sufficient to establish temporal proximity." *Pratt*, *6 (citations omitted); *Keyser v. Sacramento City Unified Sch. Dist.*, 238 F.3d 1132, 1141 n.4 (9th Cir. 2001) *opinion amended and superseded on denial of reh'g*, 265 F.3d 741 (9th Cir. 2001) ("our subsequent cases make it clear that a proximity of three months or more is

11

insufficient to create a genuine issue of material fact").

MacIntyre has no evidence he reported Title IX sex discrimination claims "very close" in proximity to the alleged retaliatory action, i.e.—Carroll's return of the Head Golf Coach position to a stipend position when the contract expired on June 30, 2018.  MacIntyre admitted in an email produced in discovery that his complaints about Title IX were early in his contract period (commencing July 1, 2016) and that he "let the issue be" because he thought it would take two years for Gross to complete his analysis.  (SUF¶¶96-98).  Any alleged protected activity of MacIntyre is too remote to establish a causal link to the nonrenewal of his contract when it expired on June 30, 2018, or to any other alleged acts of retaliation.

Further, although Lori Peterson, Vice President of Finance, Administration & Facilities ("Peterson"), McMahon's supervisor, is not the focus of MacIntyre's Amended Complaint, Peterson was aware MacIntyre had raised Title IX concerns, not based on sex discrimination, to McMahon in January 2016 and she signed MacIntyre's 2016 Settlement Agreement (Apr. 13, 2016).  (SUF¶73).  MacIntyre cannot establish the requisite temporal proximity between Peterson's general knowledge of MacIntyre's concerns on or before April 2016 and the nonrenewal of his contract when it expired on June 30, 2018.

## II.   CARROLL HAS LEGITIMATE, NON-RETALIATORY REASONS FOR ITS ACTIONS.

### A.   MacIntyre's Employment Contract Was Not Renewed Due To $1.2 Million In Campus-Wide Budget Cuts.

#### 1.   In 2017, Due To Declining Student Enrollment, Carroll's Budget Committee Anticipated A $1.2 Million Shortfall In Fiscal Year 2018/19.

Vice President Peterson, Chair of the Budget Committee (a/k/a Resource and Planning Committee), testified Carroll started seeing dips in enrollment in the 2015/16 fiscal year.  (SUF¶99).  To address its structural operating deficit, Carroll relied on its advisory Budget Committee, comprised of 21 members of a cross-section of Carroll's community.  (SUF¶¶100-02).

The Budget Committee was transparent with the community about the budget.  (SUF¶105).  On December 12, 2016, Peterson emailed budget managers, including MacIntyre, explaining Carroll was "challenged with external economic and political uncertainties," that "business as usual is not an option in the world in which we are living," and that, moving forward, Carroll would emphasize "prudent fiscal management" by re-evaluating resource allocation.  (SUF¶¶106-109).

On June 27, 2017, the Budget Committee anticipated a $1.2 million operating budget shortfall over fiscal year 2018/19 where operating expenses were anticipated to exceed revenues.  (SUF¶110).  The Budget Committee discussed the

13

need to adjust the budget in anticipation of the shortfall.  (SUF¶111).

On July 11, 2017, the Budget Committee decided to "give each Division head a % of budget to cut to get the total needed to reduce the budget." (SUF¶114).  Carroll calculated the percentage of the overall budget represented by each program and applied this percentage to the budget shortfall to determine the amount of budget reductions to each program.  (SUF¶115).  Every reduction for fiscal year 2018/19 totaled roughly $1.2 million.  (SUF¶116).  The Budget Committee's recommendations for percentages to reduce the budget were starting points for each department with some contributing more toward the budget cuts and others less than the requested amounts.  (SUF¶133).

On July 14, 2017, Peterson updated the Carroll community on the budget. She explained "approximately 90 percent of Carroll's operating revenue is derived from enrollment—i.e., net tuition, housing, dining and fee revenues," that Carroll began the 2017/18 fiscal year with a significant projected net student-generated shortfall, and that the Budget Committee would be focused on balancing the projected budget to the anticipated shortfall.  (SUF¶¶117-18).

On July 18, 2017, Peterson communicated to Gross that athletics needed to cut 12 percent from its budget, $218,152.96, over two years:  FY 2017/18 ($79,537.24) and 2018/19 ($138,615.72).  (SUF¶119).

14

**2.      Athletic Director Gross Identified $198,753 Of The $218,152.96 In Athletics' Budget Cuts To The Budget Committee On August 8, 2017.**

The Budget Committee's August 8, 2017 minutes reflect Gross presented "$79,537 in reductions for FY 17-18," and that for the request for $138,616 in budget cuts for FY 2018/19, he had "$19,400 still to find." (SUF¶131). Gross had identified a total of $198,753 of the requested $218,152.96 in athletics' budget cuts. (SUF¶130).

**3.      Gross Identified Budget Cuts That Would Minimize The Impact On The Students.**

In identifying the budget cuts, Gross explored reductions that would minimize the impact on the students. (SUF¶120). There were two positions that had previously been successfully managed in part-time stipend positions, the Head Golf Coach position and the Head Cross-Country Coach position. (SUF¶121). Gross proposed changing both positions back to stipend positions as those two changes would still meet the coaching requirements to fulfill the needs of student athletes. (SUF¶¶122-23).

In reaching the decision to recommend the full-time Head Golf Coach contract position return to its historic stipend position, Gross's "[c]onsiderations were first financial." (SUF¶124). Gross looked at participation numbers in the program over time. (SUF¶125). The Golf Program had consistently retained a roster of 20 student athletes in a stipend position. (SUF¶126). Gross also looked

15

at the Frontier Conference institutional data report which provided what FTEs and what types of assignments were given to coaches.  (SUF¶¶127-28).  In the Frontier Conference, four of the six Head Golf Coaches were in part-time positions. (SUF¶128).  Gross also considered competitive schedules and the amount of travel. (SUF¶129).

### 4.   Gross Presented Options For Additional Cuts To The Budget Committee On January 17, 2018.

On January 17, 2018, Gross presented options to the Budget Committee for further reducing athletics' budget, including eliminating the sport of golf. (SUF¶134).  He also presented other options including adding scholarships to the Golf Program for potential revenue growth.  (SUF¶134).  As a result of the discussions, the Budget Committee did not eliminate golf.  (SUF¶136).  Carroll (including Gross) did not want to eliminate golf, and Carroll did not eliminate any sport, in its budget reductions.  (SUF¶¶137-138).  The discussions before the Budget Committee about the presence of the Golf Program were a direct result of the budget deficit and did not occur prior to it.  (SUF¶139).

### 5.   Gross Recommended On January 24, 2018 The Full-Time Head Golf Coach Contract Position Be Returned To Its Historic Stipend Position.

On January 24, 2018, the Budget Committee minutes reflect, "Athletics decided not to cut golf, but will make the coach a stipend position."  (SUF¶140). The Budget Committee accepted Gross's proposed reductions in the amount of

$198,753 over two fiscal years (2017/18 and 2018/19), a reduction from the initial request for $218,152.96 in budget cuts.  (SUF¶141).

>  **6.** **On March 16, 2018, The Budget Committee Recommended Budget Cuts To The Carroll President, Including Returning The Full-Time Head Golf Coach Contract Position To Its Historic Stipend Position.**

The Budget Committee provided its budget recommendations, which included the return of the Head Golf Coach position to its historic stipend position, to the President on March 16, 2018.  (SUF¶143).  The Budget Committee's recommendations identified specific budget cuts various Carroll departments could make, including personnel cuts, to balance its budget.  (SUF¶144).  According to Peterson, "[p]ersonnel is the last place we go at Carroll," but "[w]e needed to find permanent reductions to build a business model that's sustainable for the future of Carroll."  (SUF¶145).  The budget decisions were not based on seniority but looking at what were the best decisions "to necessitate a financially viable model for Carroll."  (SUF¶146).

Carroll did not look at reductions "on a person basis," and instead focused on how to "deliver programs with the least impact to our students."  (SUF¶¶147-48).  The Budget Committee reduced the budget strategically for what was in the best interest of Carroll's students—and would have the least negative impact to Carroll's student population.  (SUF¶149).  The Budget Committee recommended, as part of $1.2 million in budget cuts to the 2018/19 fiscal year, that the Head Golf

17

Coach contract position return to its historic stipend position as the Golf Program had success with a Head Golf Coach in a stipend position.  (SUF¶150).  The decision was purely budgetary.  (SUF¶151).

The Budget Committee did not discuss any alleged complaint of MacIntyre. (SUF¶152).  McMahon did not participate in the Budget Committee's decision to return the full-time Head Golf Coach position to a stipend position.  (SUF¶153). Gross was not a voting member of the Budget Committee and did not vote on whether to approve any budget cuts, including to the Golf Program.  (SUF¶154).

### 7.    The Trustees Approved The Budget On May 11, 2018.

After the President approved the Budget Committee's recommendations on March 16, 2018, the recommendations were in turn considered by the Trustees' Finance Committee on May 10, 2018, and ultimately the Trustees voted to approve the budget on May 11, 2018 effective July 1, 2018, the beginning of the fiscal year. (SUF¶¶157-58).  The Trustees approved roughly $1.2 million in budget cuts in fiscal year 2018/19, including $543,752 in personnel cuts.  (SUF¶159).  The Trustees' 2018 comprehensive, campus-wide budget cuts included budget reductions to the Carroll Athletic Department in the amount of $198,753 and to Academics and Academic Support in the amount of $445,349.50.  (SUF¶¶161-63). The Trustees' 2018 budget cuts were allocated proportionally among Carroll's departments, and each department was required to cut a fixed percentage of their

budget.  (SUF¶162).  Personnel cuts comprised 45 percent of the Trustees' 2018 budget cuts, including a reduction of approximately 15 FTE employment positions that were spread proportionally across seven divisions at Carroll.  (SUF¶¶164-65).

The personnel change for MacIntyre's position as Head Golf Coach from a full-time, salaried position to a part-time stipend position amounted to a 0.63 FTE reduction.  (SUF¶170).  As a result, Carroll realized approximately $32,947 in savings (for wages and benefits).  (SUF¶171).  Carroll's decision to return the Head Golf Coach position to its historic stipend position comprised 6% of the total personnel-cost reductions during that time.  (SUF¶172).

All personnel-cost reductions included in the roughly $1.2 million dollar budget cuts were to address Carroll's structural operating deficit.  (SUF¶166). The Trustees' approval of $1.2 million in budget cuts on May 11, 2018 was in response to Carroll's structural operating deficit and not motivated by other factors.  (SUF¶213).  Carroll's Budget Committee up to the Trustees made business recommendations and decisions "with the least impact on our students." (SUF¶¶147,149,167).

### B.   Carroll Has Legitimate, Non-Discriminatory Reasons For The Other Alleged Acts Of Retaliation.

Carroll has legitimate, non-discriminatory reasons for MacIntyre's other alleged acts of retaliation listed in his Amended Complaint.

### 1. MacIntyre Relocated His Office From The Administrative Office Area Seven Months After He No Longer Had Administrative Duties.

Carroll had legitimate, nondiscriminatory reasons to request MacIntyre relocate from the administrative office area in January 2017 because after July 1, 2016, MacIntyre no longer had administrative responsibilities.  (SUF¶¶242-43, 245).  MacIntyre assumes the move was because Gross wanted the prime space. (SUF¶244).  Gross was trying to create an administrative office area for athletic staff who perform administrative functions.  (SUF¶¶244,248-249).  Gross offered for MacIntyre to move to one of two other locations because MacIntyre no longer had administrative duties.  (SUF¶245).  MacIntyre likes his office location. (SUF¶247).

### 2. The Head Golf Coach Position Is A Part-Time Position.

MacIntyre claims after his one-time contract expired June 30, 2018, and returned to its historic stipend position, that: (1) Carroll increased his responsibilities as a stipend coach; (2) imposed mandates no other coach was required to follow (workout and practice schedules); and (3) required a roster size of twenty (20) athletes, without providing funding for recruitment and/or scholarships.  (SUF¶251).

Carroll has legitimate, non-discriminatory reasons for the stipend position,

and MacIntyre's duties did not increase.  His duties were the same in the historic

stipend position as in the one-time contract position.  According to McMahon (as

Director of Human Resources), the Head Golf Coach position responsibilities have

remained the same since 2006.  (SUF¶256).  From 2006–2016, MacIntyre

performed the duties in a stipend position while also employed full-time in two

other positions.  (SUF¶257).

Carroll has legitimate, non-discriminatory reasons for setting the roster

number at 20 athletes.  (SUF¶252).  All sports are provided roster expectations,

and the roster number of 20 for golf is consistent with the Golf Program's roster

numbers when the Head Golf Coach was in a stipend position.  (SUF¶252).  The

roster expectation did not increase.  (SUF¶252).  MacIntyre controls his own

budget and may allocate resources to recruitment.  (SUF¶254).  Scholarships are

proportionally given to the proportion of male and female students that participate

at Carroll.  (SUF¶255).  Further, workout and practice schedules are requested

from all coaches for facility procurement.  (SUF¶253).

### 3.     Booster Club Money.

MacIntyre claims Gross would not permit him to start a booster club for

golf.  (SUF¶259).  MacIntyre made the request on April 5, 2018.  (SUF¶260).

After Gross became Athletic Director in March 2016, he did not allow any new

booster clubs.  (SUF¶261).  Gross did not permit new booster clubs because it was

more beneficial to raise funds without booster clubs as they create expectations to their members for certain benefits/gifts which reduces the amount of funds raised. (SUF¶263).  There is no prohibition on the Golf Program, or any sport, to fundraise, and some programs have been very successful in fundraising. (SUF¶¶262,264).  The Golf Program has not fundraised.  (SUF¶265).

### 4.   Submission Of Program Information Report.

MacIntyre claims Carroll changed his Program Information Report to the administration in December 2019 (after his alleged termination) to sterilize any mention of Title IX.  (SUF¶272).  Carroll provided legitimate, non-retaliatory reasons for the submission of the version of the report that did not mention Title IX.  Gross, the Approver, thought the final report MacIntyre submitted to him was the same one he had saved as a PDF ready for submission to the entire Carroll community; however, MacIntyre did not notify Gross that he had made any new changes.   (SUF¶¶273-276).  After the miscommunication was discovered, Gross submitted the modified report which mentioned Title IX.  (SUF¶277).

### 5.   Golf Program In Lowest Quintile.

MacIntyre claims Carroll placed his program in the lowest (5th) quintile for evaluation and possible elimination.  (SUF¶278).  The Program Prioritization Task Force (a/k/a Committee) ("Task Force") placed the Golf Program, and 20 other administrative programs, in the 5th quintile on January 14, 2019.  (SUF¶279).

Carroll President Dr. Cech appointed the Task Force on October 5, 2018 to evaluate academic and administrative programs and make recommendations to invest in the program and to identify program cuts.  (SUF¶280).  Because the deliberations of the Task Force are confidential, the reasons for the Golf Program's placement in the 5th quintile are unknown.  (SUF¶282).  The 105 administrative programs (including the Golf Program) were placed in one of five quintiles (21 programs in each quintile).  (SUF¶279).

Other than Peterson communicating to the Task Force Chair about the need to replace the report, neither Peterson, McMahon, nor Gross had any conversations with the Task Force about the Golf Program or MacIntyre.  (SUF¶¶284-85).  Further, after the Golf Program was placed in the 5th quintile, Gross worked with MacIntyre on a Program Analysis Report, and Gross recommended the Task Force enhance the Golf Program by infusing money for scholarships into the program.  (SUF¶¶286-87).

## III.   MACINTYRE CANNOT MEET HIS BURDEN TO SHOW CARROLL'S REASONS ARE BOTH FALSE <u>AND</u> THE REAL REASON IS RETALIATION.

MacIntyre cannot meet his burden to establish Carroll's legitimate, non-retaliatory reasons for its decision to change the full-time Head Golf Coach contract back to its historic stipend position or the other alleged retaliatory acts are pretext because MacIntyre is unable to show Carroll's reasons are both false

23

*and* that the real reason is retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext for *discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") (emphasis in original); *see also Dugas v. Lockheed Martin Corp.*, 725 Fed. App'x. 573, 574 (9th Cir. 2018) (same) (citation omitted). The budget crisis at Carroll and the Golf Program's success managed by a Head Coach in a stipend position from 2006-2016 are well documented and MacIntyre cannot show otherwise. (SUF¶¶99-172 (budget crisis), SUF¶¶202-05 (program success)).

Nor can MacIntyre establish that discrimination was the real reason for any alleged retaliatory act. To meet his burden, MacIntyre must show that the alleged retaliation would not have occurred but for the alleged protected activity. *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* 570 U.S. 338, 352 (2013) (but-for causation standard applies to Title VII retaliation claims); *Emeldi*, 698 F.3d at 725 (in the Ninth Circuit, "the Title VII framework generally governs Title IX retaliation claims"). MacIntyre cannot meet his burden.

## IV. CARROLL IS ENTITLED TO SUMMARY JUDGMENT ON MACINTYRE'S INDIVIDUAL EMPLOYMENT CLAIMS WHICH HE RELEASED IN HIS 2016 SETTLEMENT.

### A. This Court Has Jurisdiction To Enforce Macintyre's 2016 Settlement Where He Released The Same Claims He Reasserts In His Amended Complaint.

This Court has jurisdiction to determine whether MacIntyre's claims are

barred by his 2016 Settlement.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 382 (1994) (enforcement of settlement agreements is for state courts unless there exists an independent basis for federal jurisdiction).  The Court has subject matter jurisdiction over MacIntyre's Title IX retaliation claims and ancillary jurisdiction over the claims in MacIntyre's Amended Complaint that he released in the 2016 Settlement.  *See Peacock v. Thomas*, 516 U.S. 349, 355-56 (1996) (ancillary jurisdiction extends to "claims having a factual and logical dependence on 'the primary lawsuit,' but that primary lawsuit must contain an independent basis for federal jurisdiction") (internal citations omitted) (quoting *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 376 (1978); *In re Suchy*, 786 F.2d 900, 902-03 (9th Cir. 1985) (citation omitted) ("[I]t is well settled that a court has inherent power to enforce summarily a settlement agreement involving an action pending before it.").

    **B.**    **MacIntyre Released Any And All Individual Employment Claims In His 2016 Settlement.**

The 2016 Settlement requires it be "enforced in accordance with the laws of the State of Montana."  (SUF¶233).  In Montana, "[a] valid settlement agreement is enforceable like any other binding contract."  *B.D. By and Through Deming v. Deming*, 2020 MT 205N, ¶ 7, 468 P.3d 815, 401 Mont. 556  (Table), (quoting *Hinderman v. Krivor*, 244 P.3d 306, 310 (Mont. 2010) (citation omitted)).

Here, MacIntyre admits his 2016 Settlement released his individual employment claims against Carroll.  (SUF¶¶75-76,224-26).  He released "any and all claims" arising out of or in any way connected with his employment at Carroll.  (SUF¶¶76,226).

MacIntyre agreed the consideration provided to him under the 2016 Settlement "shall be the sole relief provided to MacIntyre for the claims that are released."  (SUF¶82).  Although MacIntyre settled his claims against Carroll on April 13, 2016, as his "sole relief" "for the claims that are released," MacIntyre's Amended Complaint includes those same claims as a basis for damages in this case.  (SUF¶¶219-23).

MacIntyre released his claims related to Kyle Baker's negative performance review of MacIntyre in March 2016.  (SUF¶225).  The 2016 Settlement required the removal of Baker's negative evaluation of MacIntyre and it was removed.  (SUF¶¶222,232).  MacIntyre admits he waived any claims related to Baker.  (SUF¶225).

MacIntyre released his claims that he was offered the position of full-time Head Golf Coach on May 22, 2015 by former Athletic Director Curt Apsey and that the former President of Carroll allegedly rescinded the offer on or about June 22, 2015.  (SUF¶220(4)).  MacIntyre admits he waived any of his claims related to the former President and any claims before April 13, 2016.  (SUF¶225).

26

MacIntyre has also released his individual claims related to bringing Title IX concerns to Carroll's Title IX Coordinator Renee McMahon on January 29, 2016. (SUF¶¶75-76,220(6),224,226).  MacIntyre claims his meeting with McMahon caused him stress, but his emotional distress really started on his "worst first date" with Athletic Director Gross in March or early April 2016, before the 2016 Settlement.  (SUF¶¶220(10),234).  MacIntyre has released any claims related to MacIntyre's alleged stress from his meeting with McMahon on January 29, 2016 and the emotional distress he alleges to have suffered from his "worst first date" with Gross—all before the 2016 Settlement.  (SUF¶¶220(10),230).  MacIntyre has released his claims for emotional distress which started before April 13, 2016. (SUF¶¶75-76,226).

MacIntyre has also released any claims related to efforts by McMahon to obtain quotes for a Title IX audit from the Association of Title IX Administrators in February 2016, and any claims related to Carroll's decision to instead use, with MacIntyre's agreement, the services of incoming Athletic Director Gross who had Title IX experience and would perform the day-to-day Title IX analysis in the Athletic Department.  (SUF¶220(6)).

The Court should dismiss all claims in the Amended Complaint which MacIntyre released in his 2016 Settlement.

## V.   MACINTYRE'S CLAIMS WHICH ACCRUED ON OR BEFORE JUNE 21, 2016 ARE BARRED BY THE THREE-YEAR STATUTE OF LIMITATIONS.

In the Ninth Circuit, "Title IX claims are subject to the applicable state statute of limitations for personal injury actions." *Stanley v. Trs. of Cal. State Univ.*, 433 F.3d 1129, 1136 (9th Cir. 2006).  Under Montana Code Annotated § 27-2-204, the statute of limitations for personal injury actions is three years. Although state law provides the applicable limitations period, federal law governs when the limitation period commences.  "[T]he touchstone for determining the commencement of the limitations period is notice: 'a cause of action generally accrues when a plaintiff knows or has reason to know of the injury which is the basis of his action.'"  *Stanley* 433 F.3d at 1136 (internal citations omitted).

Here, MacIntyre filed his Complaint on June 21, 2019.  (SUF¶214).  The applicable three-year statute of limitations bars claims that accrued before June 21, 2016.  MacIntyre's Amended Complaint, however, advances claims that accrued *before* June 21, 2016.  (SUF¶¶220-21,223).

The Court should grant Carroll's motion for summary judgment on all claims in the Amended Complaint that accrued before June 21, 2016.  The pre-June 21, 2016 claims include the same claims that MacIntyre released in his 2016 Settlement.  (SUF¶¶220-26).

## VI.   MACINTYRE HAS NO DAMAGES FOR HIS PURPORTED LOSS OF THE TUITION REMISSION/EXCHANGE BENEFIT FOR HIS CHILDREN.

MacIntyre will not suffer any financial loss for the purported loss of the tuition remission/exchange benefit for his two children (ages 2 and 6 on Sept. 30, 2020).  (SUF¶¶304-5,308-9).  MacIntyre admits the tuition remission benefit is conditional on Carroll's financial situation at the time his children may enter college.  (SUF¶307).  It is impossible to predict whether the benefit will exist when his children attend (or not attend) college.  If they attend college, it is unknown where they will attend and if they will attend all four years.  *Howard University v. Lacy*, 828 A.2d 733, 739, n.8 (D.C. 2003) (setting aside tuition remission award "as speculative" as based upon the questionable assumptions that plaintiff's seven-year-old daughter would attend the university and would remain there for four years—it is "'impossible to say with any assurance that such [future] damages are reasonably or probably certain to follow'"); *Kraft v. High Country Motors, Inc.*, 2012 MT 83, ¶ 61, 276 P.2d 908, 364 Mont. 465 ("Speculative damages that are not clearly ascertainable are not recoverable.") (citations omitted).

Further, MacIntyre has no financial loss related to the value of the tuition remission as MacIntyre's earnings capacity (wages and benefits) at St. Peter's Health, where he became employed after the nonrenewal of his one-time contract, exceed his earnings capacity at Carroll, and if he invests the extra income for the

29

benefit of his children it will far exceed the amount of the tuition remission benefit. (SUF¶¶304-05).

MacIntyre may also apply for full-time employment at Carroll and become re-eligible for, and use, the tuition remission benefit for his children—if it still exists when and if his minor children attend college.  (SUF¶308).  Since June 30, 2018, MacIntyre has not applied for any vacant full-time positions at Carroll. (SUF¶¶310-16).

## CONCLUSION

Carroll is entitled to summary judgment as a matter of law.  Carroll respectfully requests the Court grant its motion.

DATED April 2, 2021.

CROWLEY FLECK PLLP

By:   /s/ Marcia Davenport
        Marcia Davenport
        John M. Semmens
        P.O. Box 797
        Helena, MT  59624-0797
        *Attorneys for Carroll College*

## CERTIFICATION OF COMPLIANCE

Pursuant to United States District Court for the District of Montana Local Rule of Procedure 7.1(d)(2)(E), I certify this pleading contains 6493 words, as calculated by Microsoft Word for Windows, excluding the caption, certificates of services and compliance, table of contents and authorities, and exhibit index.

CROWLEY FLECK PLLP

By:   /s/ Marcia Davenport
Marcia Davenport
John M. Semmens
P.O. Box 797
Helena, MT  59624-0797
*Attorneys for Carroll College*